Good morning, Your Honors. May it please the Court, Minerva Melendrez, on behalf of Petitioner Julius Amane-Frederick, I would like to reserve six minutes for my co-counsel's rebuttal and will be watchful of my time. Go right ahead. Julius is a gay man from Nigeria, a country that criminalizes homosexuality. He asked this Court's review on two issues. First, the agency committed both legal and factual errors in its future torture analysis under the Convention Against Torture. Second, the agency committed two separate and independent legal errors when it determined that Julius's conviction constituted a particularly serious crime. Starting with future torture under CAT, we principally draw attention in that the agency legally erred by failing to engage with critical country conditions evidence. This Court held in Colby Holder that the agency's failure to engage with highly probative or potentially dispositive evidence is a reversible error. In here, the agency failed to analyze how Nigeria's laws criminalizing homosexuality impact Julius, who is an openly gay man. These laws create the catalyst for widespread animus that lead both citizens and state actors to stone, cane, rape, and in the case of Julius's lover, murder LGBTQ individuals. We know his lover disappeared. Do we police custody? And if we look at the timeline, we see that the lover... Also, I don't want to take a lot of time on this and your time is limited. So, we're familiar with the record. I just want to be clear that I think what he testified to is that his lover was taken into custody and then never seen again. Your Honor, that's correct. Is that fair? I'm not trying to split hairs. I just want to be clear that I didn't miss something. Yes, Your Honor, that's correct. The lover was taken into custody and then died in police custody. Okay. So, okay. Let's move on. Okay. I'm more concerned about the characterization of your client's own history and abuse. I think that IJ used the word bullying. Yes, Your Honor. And that's one of the legal errors that we call attention to in the past torture analysis. This court held in Xochitl, Jaimes, and Avendano, Hernandez that rape, when committed on the basis of sexuality, constitutes a particular type of egregious violation of humanity that certainly rises to the level of torture under CAT. And here we see the agency did not even reference the 2015 rape. They characterized it as a bullying and attack, which minimizes it in a legally relevant way because a beating and a bullying may not always constitute torture, but a rape certainly does when committed on the basis of So is your contention that's legal error? Our contention is that that is a legal error in the past torture analysis, which then impacts the future torture analysis as well. We also want to call attention to the fact that the agency didn't engage with the fact that Julius is a Muslim man. And as a result of his faith, he would be subject to torture as under Sharia law, people are sentenced to stoning and caning, which is enforced by Nigerian authorities. Furthermore, the main error here is that when we look at the BIA decision, we see a mere summarization of Julius's argument, and this is on CAR-4. This court held that a fleeting and dismissive reference to persuasive evidence indicates that the agency has not lived up to its obligation to carefully consider the country conditions evidence. And here we see no type of engagement with the fact that Julius is an openly sexual man. And Nigeria has evidence on CAR-264 through 266. The 2003 Nigerian Human Rights Report shows that individuals are targeted on the mere perception of sexuality. Julius since fleeing Nigeria and arriving in the United States has now begun painting his nails, growing his hair long, and dresses like a woman. And he shouldn't have to hide that part of himself. Can I ask you a question? The agency found that he had not shown that he could not relocate. And that is an independent ground for denying his relief. And he did not challenge that so far as I can tell, the IJ's finding. So what do we do with that? Is there a failure to exhaust here? Your Honor, we would argue that Julius did argue relocation. Specifically, under matter of ZZO, the main inquiry, and this is in footnote one, the main inquiry is whether the petitioner has meaningfully challenged. And we see in his brief CAR-17 through 18, Julius discusses the countrywide laws and how this would lead to his torture. And then he continues to talk about his religion and how this would also lead to his torture. Although he didn't use the precise term impossibility of relocation, it's not necessary that he use the exact terminology. And because of the general contention that he made, we would argue that this court does have the authority to review the relocation argument. Well, the record does show, you referenced Sharia law, and the record establishes that not every state within Nigeria has Sharia law. So I think that relates to the point that Judge Schroeder is getting to about relocation of the status of the law for homosexual people is not the same across the entire country. So what do we do with that? Your Honor, Sharia law may only be enforced in the northern states. Nevertheless, we still have the countrywide law that criminalizes homosexuality. And that creates the catalyst for pervasive violence against these individuals. In Abbas, this court held that pervasive and homophobic attitudes do demonstrate particularized risk of torture. And when we look at CAR-265 through 266, we see the same type of widespread animus being given to these LGBTQ individuals. Moreover, in 2019, a spokesperson for the Lagos Police Department told LGBTQ individuals to flee the country or face prosecution. And in Uc Incarnacion, this court held that when a government intentionally targets a group based on a particular characteristic and the petitioner belongs to that group, that is enough to show that there is a particularized risk of torture. I have one other exhaustion-related question. In your client's brief to the BIA, the only reference made to past torture is in a heading, and there is no developed legal argument about that. And so I'm trying to figure out, for purposes of exhaustion, what's before us with regard to the past circumstances that he's suffered? Your Honor, we do take note of the heading. And although I cannot speak for the BIA, we do argue that the heading does say that the evidence established that respondent was subjected to torture in Nigeria. And here, we argue that that's a clear enough reference to the past to put the board on notice of this argument. But would you agree with me there's no developed argument on that point? Your Honor, we would say that aside from the past reference in the heading, Julius doesn't necessarily continue on to talk in the past tense, but he does make claims regarding future torture analysis. And past torture is a principal factor to consider for future torture. On CAR-4, we also see that the board did consider evidence of past torture. They referred to the, quote-unquote, attack and bullying. And that in itself shows that they did have the opportunity to consider the issue. I do see that I'm running short on time, and I do want to turn to the particularly serious crime determination before my co-counsel— Any better? Yes. Turn to it. Yes. The principal error here occurred at the first step in analyzing the nature of the conviction. As you may know, and I'm sure you know, under the nature of the conviction, the agency must first look at whether the elements of the offense alone bring it within the ambit of a particularly serious crime. And here at the first step, we argue that the agency made two errors. First, it considered the incorrect statutory elements. And second, the agency improperly considered facts and elements. I want to focus on the incorrect statutory elements because in Whitfield v. United States, the Supreme Court held that what differentiates conspiracy from the general money laundering offense is an overt act. And on CAR-35, we see that the immigration judge articulated the offense as requiring a knowing fraudulent engagement and a specific loss amount. These are overt acts. And as a result, we would ask that this court remand for the agency to the correct elements. And I do see that I'm out of time. And if there are no further questions, I would love to turn it over for my co-counsel to close it off. All right. Are you saving time for rebuttal? Yes. We're reserving six minutes for rebuttal, and that'll be my co-counsel. Okay. So that's what you meant. Okay. All right. Thank you. Go right ahead. You confused me for a minute. That's all right. Go right ahead. Good morning. May it please the court? My name is Christina Ziden, and I represent the acting attorney general. We ask this court to deny the petition for review. I'd like to spend a little bit of time speaking about the particularly serious crime analysis and then move on to cap protection. Going to the particularly serious crime analysis, we argue that there's only one preserved for this court's review, and that is whether the elements of the crime brought it within the ambit of a particularly serious crime. With the conviction at issue here, Mr. Frederick was convicted of conspiracy to commit money laundering under 18 U.S.C. 1956H. We want to draw the court's attention to the fact that this was also a ground of for Mr. Frederick, his conviction for an aggravated felony. And we also want to draw the court's attention to the fact that 18 U.S.C. 1956 is one of the few criminal statutes that is specifically and explicitly referenced in the Immigration and Nationality Act as constituting an aggravated felony. And so the immigration judge, by the time he performed the analysis as to whether the elements brought it within the ambit of a particularly serious crime, had already considered this crime for purposes of removability. And so really what we're seeing here is the second time that the immigration judge analyzed the elements. And this wasn't a situation like a crime of violence situation where there had to be an analysis. 18 U.S.C. section 1956 is specifically mentioned in the Immigration and Nationality Act. The immigration judge stated twice in his particularly serious crime analysis that this is a categorical aggravated felony. The immigration judge also quoted the text of section 1956 and specifically of subsection H, which is the conspiracy crime. The immigration judge clearly stated that this was a conspiracy and that I don't quite understand the government's position. The particularly serious crime is different from an aggravated felony, right? It is different, yes. But this court has held under Guerrero versus Whitaker that aggravated felonies are the types of crimes that are most likely to be particularly serious. But once, if it's a given that it's a aggravated felony, there has to be a separate analysis for particularly serious crime, doesn't there? Go ahead. I thought that was a problem. So the immigration judge did analyze the elements here. The immigration judge specifically listed that this was a crime that involved knowledge and that this was a crime that involved a specific intent. And then the immigration judge explained that that specific intent evidenced a patent disregard for the social and moral standards expected of those living in a civilized society. And that is when he concluded that the elements brought it within the ambit of a particularly serious crime. And so the immigration judge did reference facts of the offense, but our position is that that's not dispositive here because the immigration judge also did perform the elements-based analysis. And also our position here is that any other argument regarding the particularly serious crime analysis is just not exhausted. The brief that was filed before the board by Mr. Frederick's prior counsel only had three sentences on the particularly serious crime analysis. Those first two sentences had to deal with the elements-based analysis that we just discussed. And then the third sentence was the IJ also did not apply the factors from matter of frontiscue. That sentence, that argument is presently conceded that the immigration judge did apply those elements from matter of frontiscue and matter of NAM. And so can we turn to the CAT claim? I'd like to hear your response for why it is that as we look at the agency decisions here, how we can conclude that the agency considered all of the relevant evidence in terms of figuring out the likelihood of torture. As already been referenced, there's no reference in the agency's decisions to the sexual assault that the petitioner was found to credibly testify about. And there's also no reference to aspects of the country conditions that seem particularly relevant here. So I'd like you to address those two points. So as far as the board did reference and the immigration judge did reference that Mr. Frederick was harmed in the past, as far as whether that harm rose to the level of past torture, our position is that that's just not exhausted. There was no substantive argument or developed argument with regard to that before. I think that's probably right. But our law says that even if the petitioner doesn't exhaust an issue, if the agency addresses it, then we're not going to put our head in the sand, so to speak, and decline to address the issue. And it seems like that applies here. Why am I wrong about that? Well, the board did address that there was past mistreatment, but the board didn't analyze, didn't perform the analysis, I believe, of whether that constitutes. That's the problem. That's your problem. It mentioned it, and I think used the word bullying. But he testified to being kidnapped and raped. I believe that they also used the term beating. And so the board. That doesn't make it better, right? That doesn't make it better for you. I'm sorry, the term what?   No. So, Counselor, your position, since they raised this, sorry, reached this issue and characterized it the way they did in a way that I think is not supported by the record, I'm concerned about what your response is. Well, we do argue that it's not exhausted, actually. They didn't reach it. But they reached it. The BIA reached it. Well, we don't agree that they did reach. Okay, so can you explain? We agree that they discussed the past harm, but we don't agree that they reached the legal analysis. Do you think that under the appropriate standard that this was not, I guess you are arguing that it wasn't exhausted? Yes. So can you want to do that analysis for us, please? Do you think it wasn't teed up even though they did reach it or they did mention it and describe this as bullying? Is that the government's position? Yes, that is correct. All right. Yes, and so under this court's, this court has held in Aiden versus Zhang that the petitioners there raised the straightforward question of whether the immigration judge erred in denying cat protection for the reasons stated. This was not a case like that. In Gonzales-Castillo versus Garland, this court distinguished Zhang and noted that in that case, petitioner had raised certain arguments, but had not raised others that the petitioner was then bringing before the court. Oh, go right ahead. Sorry. I'm trying to figure out. So I'm looking at the BIA's decision and it clearly says the immigration judge considered the respondent's testimony that was previously targeted for mistreatment, in particular bullying and a beating in 2015 due to sexual orientation. So clearly the BIA is considering the past harm that the petitioner testified about. So I don't understand the argument that you're making that the issue is not exactly that the agency didn't reach the question, because my understanding here is the agency wouldn't be considering the granting of relief solely on the basis of past harm. The agency would be considering granting relief based on the likelihood of future torture and relevant to figuring out the likelihood of future torture is what has happened in the past. So if I'm right about that analysis, I don't understand the argument that the BIA didn't get to the question of past events. Well, we do agree that the board did consider that there was past harm in this case. So then don't you also have to concede that this is exhausted under our law that says that regardless of what the petitioner does, if the agency gets to the issue, we can get to the issue. Well, we don't concede that this was exhausted because the board didn't exhaust it in a legal sense. I really don't know what you mean. Well, we believe that the board performed a forward-looking inquiry here. The board decided whether Mr. Frederick exhibited a particularized risk of torture. Exactly. And we've said repeatedly that the most relevant factor regarding the risk of future torture is the past conduct. And so they've characterized the past conduct in the way that we've just been describing as bullying, but he testified credibly to being kidnapped and raped. So I really don't understand the exhaustion argument. And I don't mean to sort of keep coming back to this, but I think maybe we've given you several chances. And if your argument is that this isn't sufficient under our standard, I'll take that as your answer, but I want to make sure there's nothing else left on the table. That's correct. Okay. I appreciate that. Could you talk about relocation, please? Yes. So our position on relocation is that that also isn't exhausted. And here the board specifically stated in its decision that Mr. Frederick did not challenge that. You heard opposing counsel this morning. What's your response to opposing counsel's argument? So our response. That he described basically that this is a nationwide law. There's Sharia law that doesn't apply nationwide. And then there's the codified law that does. Not sure that he used the term. I'm not suggesting he used that term. I'm talking about the BIA. And so with that, our position is that Mr. Frederick still, I'm sorry, the question is about whether he's exhausted the internal relocation. My question is, would you give us the government's position on relocation? Yes. And so our position on relocation is that it's not exhausted, but that the. And so I think that has to be kind of just drill down on that. That's because you think that the board didn't address this. We believe that the board did address the fact that there are laws in the country that ban support for homosexuality. So I'll just wait for you to tell me your position on exhaustion. OK, so we believe that the board did address the laws, but the board did say that there, but the board did say that Mr. Frederick did not challenge the internal relocation finding that there are places where he could relocate that where his risk of torture would be mitigated. We are. We are also saying that the internal relocation is just one factor. And so it's not. What is the government's strongest argument regarding the Kat claim? What's your strongest argument? That he did not present a risk that or he, excuse me, that he did not present evidence that he faces a present threat, that he did not present evidence that he he basically, he was harmed in 2015, left in 2016, and he has not shown, despite the fact that he testified that his he he was outed to his family, his community would know that he is gay. He did not present evidence that he has experienced any sort of threat or has received directly or indirectly any sort of, you know, any sort of threat since that time. It's been and it's been it's been 10 years. Did I cut you off, Judge Schroeder? I mean, on that last point, I think both of the country conditions reports that we have in the record address that. And I don't see any reference in the agency's decisions to those aspects of the country conditions report. I'll read one of them to you. LGBT persons reported violence, threats, including extortion and harassment based on actual and perceived sexual orientation or gender identity or expression, including by state actors. There's no reference to that in the agency's decision about like what to make of that fact. In the other report, it says incidents regarding attacks from community members against individuals suspected to be homosexuals occur frequently in Nigeria with total impunity for perpetrators. Doesn't don't you think that that evidence is pretty relevant to the question of whether this individual, if he gets sent back to Nigeria, is going to be subjected to torture? Well, the the immigration judge and the board referenced evidence that allegations of torture against the security forces are taken are are investigated and that there is corrective action taken in those cases. The immigration judge described at length that evidence in the State Department's report and in his decision. And I believe the board referenced that as well. And so and so that and so we believe that the agency did take into account country conditions evidence. The board also recited Mr. Frederick's arguments on appeal regarding the laws in Nigeria and his risks based on his personal characteristics. And so we believe that the agency and there's also a presumption of regularity that that applies in immigration cases regarding agency action. But we believe the agency did specifically reference the country conditions in this case. No doubt. I agree with that. The agency did reference both of the country conditions reports. The question is why it referenced aspects of those reports and not other aspects of those reports when there were pieces that didn't get addressed that were particularly relevant. So we believe that the agency did reference relevant aspects of those reports, but also the the agency didn't just look at reports. The agency looked at Mr. Frederick's individual characteristics in this case and and determined that he didn't present a particular risk based on his individual characteristics. Anything further? Thank you for your argument. Council.  Good morning, Your Honors, and may it please the court. This is Tanvi Nguyen on rebuttal for the petitioner. I'll be addressing Julius's particularized risk and the issue of PSC. Starting with Kat, Your Honors, Julius faces a particularized risk based on his past torture and country conditions evidence. This is not a case about generalized risk. Julius faces unique risks throughout Nigeria because of his identity. In the past, he was raped for being gay. He was told to stop being gay by his rapist and told to be a real man. Under Xochitl Wahimus, this shows a likelihood of future torture. He was told the same thing by his family, I think, essentially. Yes, Your Honor. At CAR 181, he states that his family now knows he is gay along with his mosque, and they have cut him off. Your Honor, one procedural question. If we conclude that your client did not exhaust the relocation point, do you lose? No, Your Honor. Relocation is but one factor under Maldonado. The petitioner does hold that he did not waive this argument because his appeal brief at pages 17 and 18 showed that he did meaningfully challenge the relocation finding under matter of ZZO. Because he referenced the nationwide laws? Yes, Your Honor. He pointed to evidence showing that there are laws throughout Nigeria that criminalize his identity. And in the past, we know from the record that he was raped for being gay. And with Sharia law in the north, he is not safe anywhere in this country. Further. But what is the evidence that your co-counsel referred to regarding the officially sanctioned conduct? Yes, Your Honor. CAR page 264 shows that there are laws and Sharia, which are enforced by authorities. But I wasn't referring to the Sharia law. I was talking about the I don't think it's military forces. I think police forces who made an announcement directing people to leave the country. Yes, Your Honor. Sexuals to leave the country. Yes, that is CAR page 518. Can you review that and tell me just just explain your theory of the legal analysis of that evidence, please? Yes, Your Honor. The fact that a police spokesperson for the largest state in Nigeria warned gay men to leave shows the country's position toward gay men. In Bromfield, this court held that laws and public animus show that gay men are not safe in the country. And this is the evidence that we have here. And furthermore, Your Honor, all of these facts together, combined with evidence of public officials involvement, show that there is widespread animus throughout Nigeria. And this is something that Julius faces no matter where he is in the country. Opposing counsel argues that your client hasn't received threats for many years. And I think that's correct on our on our record. You want to respond to that, please? Your Honor, Julius has not received threats because he fled Nigeria shortly after the rape that he suffered and after his boyfriend's death, which is mentioned at CAR page 84 and 50. How many years ago was that? Your Honor, that was about 10 years ago. And since Julius has been in the US, which he claims is his safe haven, he has been apart from the threat that waits for him in Nigeria if he were to return. Is there anything in the record concerning possible changed conditions in Nigeria since he left? Your Honor, I don't believe the record shows that conditions have changed. Instead, it shows that conditions have remained the same, that it was dangerous for Julius in 2016, and that continues to be the state of affairs today based on the country report, which is from 2023, as well as the threat from the police in 2019. Further, Your Honor, based on all this evidence discussed, no reasonable fact finder could have concluded that Julius does not face a risk of torture, especially in light of cases like Bromfield, Abass and Ramey. Your Honor, moving to the issues of PSC, as Judge Schroeder noted, there has to be a separate analysis here, and that is something that the IJ did not do. He did not analyze the correct elements for conspiracy to commit money laundering. He analyzed the elements for the general offense. At Card 34, he imposed the overt act on Julius, which is not a part of conspiracy, and referred to the elements as being fraudulent engagement and the specific loss amount. Because this analysis was lacking, there was legal error here. Furthermore, Your Honor, there is a factually analogous case from the Fourth Circuit, and in that court, they dealt with the same conviction in the context of a PSC determination, and the agency there committed the exact same error. Instead of analyzing conspiracy to commit money laundering, they considered the overt act, and that court ruled that was legal error and remanded for the agency's consideration. Well, if the elements don't rise to a particularly serious crime, then isn't there a requirement that you look at the circumstances? Yes, Your Honor. So what difference does it make if the elements didn't meet the particularly serious crime, but the circumstances we conclude show that it was very serious? Excuse me, Your Honor. I misspoke. If the elements do not bring the crime within the ambit of the PSC, then the circumstances and underlying fact are of no consequence, as this court held in Bearer v. Barr. Your Honors, if there are no further questions, thank you, and we urge remand on this case. Thank you. Thank you all. I want to thank the counsels for the petitioner for participating in our pro bono program. We appreciate your advocacy very much and all of your very careful preparation. I don't know when I last heard a lawyer refer so many times so accurately to excerpts of record. Thank you. So good for you. Thank you. And we want to thank government's counsel for your advocacy as well. We'll take that case under advisement and go on to the next case on the calendar. It's United Farm Workers v. Nome 25-407. Forgive me, 25-4047.
judges: SCHROEDER, CHRISTEN, FORREST